**TA LEGAL GROUP PLLC**
Taimur Alamgir (TA 9007)
315 Main Street, Second Floor
Huntington, NY 11743
(914) 552-2669
tim@talegalgroup.com
*Attorneys for Plaintiff Peter Macci,*
*FLSA Collective Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

PETER MACCI, *on behalf of himself,*
*FLSA Collective Plaintiffs, and the Class,*

                Plaintiff,

               - against –

FEDERAL EXPRESS CORPORATION,

                Defendant.

-------------------------------------------------------------X

**Case No:**

**CLASS AND COLLECTIVE ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiff, Peter Macci ("Plaintiff"), by and through his undersigned attorneys of record, TA Legal Group PLLC, hereby files this Class and Collective Action Complaint against Defendant, Federal Express Corporation ("Defendant" or "FedEx Express"), and alleges as follows:

## <u>INTRODUCTION</u>

1.      FedEx Express is the world's largest express transportation company.

2.      FedEx Express requires all employees to pledge to uphold the "Purple Promise", a corporate mission statement that expresses FedEx Express's commitment to superior customer service –"*I will make every FedEx experience outstanding.*"

1

3.      Throughout his 25+ years as a FedEx Express driver, Plaintiff worked tirelessly on behalf of his employer to fulfill the Purple Promise and ensure that the experiences of FedEx Express customers were "outstanding."

4.      In return for Plaintiff's decades of loyal service to the company, FedEx Express subjected Plaintiff and similarly situated employees to systematic wage theft, discriminated against Plaintiff due to his disability status, retaliated against Plaintiff for his protected complaints, refused in bad faith to accommodate Plaintiff's disability, subjected Plaintiff to a hostile work environment, and ultimately unlawfully terminated Plaintiff from his position.

5.      FedEx Express's unlawful mistreatment of Plaintiff is particularly reprehensible in view of Plaintiff's many years of faithful service to FedEx Express. It is apparent that, as far as employees of FedEx Express are concerned, the Purple Promise is a one-way street.

6.      Plaintiff filed this lawsuit to hold FedEx Express legally accountable for the illegal and shameful actions described herein.

## CLAIMS

7.      Plaintiff alleges, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., that he and FLSA Collective Members (as defined below) are entitled to recover damages from Defendants based on the following violations: (1) unpaid overtime wages due to commonly-applicable policies of time-shaving and unpaid off-the-clock work, (2) liquidated damages, and (3) attorney's fees and costs.

8.      Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL") and Fed. R. Civ. P. 23, that he and Class Members (as defined below) are entitled to recover damages from Defendants for the following violations: (1) unpaid regular and overtime wages due to commonly-applicable policies of time-shaving and unpaid off-the-clock work, (2) liquidated damages, (3)

statutory penalties for failing to provide wage notices in compliance with NYLL 195.1, and (4) statutory penalties for failing to provide wage statements in compliance with NYLL 195.3.

9.  Plaintiff further alleges that, in violation of the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), FedEx Express (1) subjected Plaintiff to discrimination and a hostile work environment based on Plaintiff's actual and/or perceived disability status, (2) failed to accommodate Plaintiff's disability, (3) retaliated against Plaintiff for engaging in protected activity, (4) wrongfully terminated Plaintiff from his position due to unlawful discriminatory and retaliatory animus. In connection with his claims under the NYSHRL, Plaintiff seeks declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

10.  Plaintiff further alleges that FedEx Express is liable to Plaintiff for failure to pay him for unused accrued vacation time.

## PARTIES

11.  FedEx Express is a Delaware corporation with an address for service of process at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. FedEx Express's headquarters is located at 3610 Hacks Cross Road, Memphis, TN 38125.

12.  Plaintiff is an adult resident of Nassau County, New York. From 1997 until his unlawful discharge in approximately June 2022, Plaintiff was employed by FedEx Express in exclusively driving roles.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.    This Court alternatively has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332, as Plaintiff and FedEx Express are citizens of different states and the amount in controversy is in excess of $75,000.

16.    This Court has personal jurisdiction over FedEx Express pursuant to CPLR § 302 because FedEx Express transacts a significant volume of business in the State of New York and contracts to supply goods and services within the State of New York.

17.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

18.    FedEx Express engages in an enterprise whose annual volume of sales made or business done is not less than $500,000 and the activities of which affect interstate commerce, in that the employees of FedEx Express (including Plaintiff) handle goods and materials produced outside of New York that have moved in interstate commerce. FedEx Express is thus an employer subject to the jurisdiction of the FLSA.

19.    Plaintiff is not subject to any arbitration agreement with respect to his claims at bar. Plaintiff, FLSA Collective Plaintiffs, and Class Members also fall within the "class of workers engaged in foreign or interstate commerce" referenced in the Federal Arbitration Act ("FAA"), §

1, and are therefore exempt from arbitration. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450 (2002).

20.     At all relevant times, FedEx Express was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL and any Regulations thereunder.

21.     At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by FedEx Express.

22.     Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

23.     Plaintiff's claims under New York State law were tolled by the State of New York from March 23, 2020 through November 3, 2020, for 228 days in connection with the state of emergency declared in connection with COVID-19 and Executive Order (A Cuomo) 202.8. and subsequent orders 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67, 202.72 [9 NYCRR 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, 8.202.72. *Matter of Echevarria v Board of Elections in the City of NY*, 183 A.D.3d 857, 858, 122 N.Y.S.3d 904 [2d Dept, May 21, 2020]).

**<u>FLSA COLLECTIVE ACTION ALLEGATIONS</u>**

24.     Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all drivers (including, but not limited to the following positions and classifications: Courier (DOT), Courier, Driver Courier (DOT), Driver Courier, Delivery Driver (DOT), Delivery Driver, and Shuttle Driver (DOT))  employed by FedEx Express in the State of New York, on or after the date that is six (6) years before the filing of the Complaint in this action ("FLSA Collective Plaintiffs").

25.     At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to FedEx Express's decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them overtime wages. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

26.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from FedEx Express. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to FedEx Express.

## RULE 23 CLASS ACTION ALLEGATIONS

27.     Plaintiff, on behalf of on behalf of all drivers (including, but not limited to the following positions: Courier (DOT), Courier, Driver Courier (DOT), Driver Courier, Delivery Driver (DOT), Delivery Driver, and Shuttle Driver (DOT)) employed by FedEx Express in the State of New York from the date six years prior to filing this Complaint until the present (hereafter "Class" or "Class Members"), seeks relief under the Federal Rules of Civil Procedure, Rule 23.

28.     Throughout the relevant periods, Plaintiff and Class Members have been similarly situated, sharing substantially similar job requirements, pay provisions, and subjected to FedEx Express's uniform decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules. This unified treatment resulted in widespread failures to pay regular and overtime wages and failure to provide required wage notices and statements in compliance with NYLL § 195.1 and § 195.3, respectively.

6

29.     The claims of Plaintiff stated herein are essentially the same as those of Class Members.

30.     Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of FedEx Express. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from FedEx Express's records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from FedEx Express. Notice can be provided by means permissible under F.R.C.P. 23.

31.     The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of FedEx Express, there is no doubt that there are more than forty (40) members of the Class.

32.     FedEx Express's enterprise-wide policies and practices affected all Class Members similarly, and FedEx Express benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

33.     Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

34.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where

individual class members lack the financial resources to vigorously prosecute a lawsuit against a corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

35.     Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs.

36.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

37.     There are questions of law and fact common to the class which predominate, including:

      a.   What are and were the policies, practices, programs, procedures, protocols and plans of FedEx Express regarding the types of work and labor for which FedEx Express did not pay Plaintiff and Class Members properly;

b.  At what common rate, or rates subject to common methods of calculation, were and are FedEx Express required to pay Plaintiff and Class Members for their work;

c.  Whether FedEx Express systematically deprived Plaintiff and Class Members in New York State of regular and overtime wages by subjecting them to automatic deductions from paid time on the basis of sham "breaks," even though Plaintiff and Class Members were denied uninterrupted, bona fide breaks required to work throughout each shift;

d.  Whether FedEx Express systematically deprived Plaintiff and Class Members in New York State of regular and overtime wages by instituting policies requiring the performance of unpaid, off-the-clock work.

e.  Whether FedEx Express unlawfully failed to provide Plaintiff and Class Members wage notices in compliance with NYLL 195.1;

f.  Whether FedEx Express unlawfully failed to provide Plaintiff and Class Members wage statements in compliance with NYLL 195.3

## **STATEMENT OF FACTS**

**Plaintiff's Employment With FedEx Express**

38.     Plaintiff's employment at FedEx Express began in 1996. Throughout his employment with FedEx Express, Plaintiff worked for FedEx Express exclusively in driving roles.

39.     From 1996 to 2019, Plaintiff was employed by FedEx Express in the position of Shuttle Driver (DOT).

40.     From 2019 until his unlawful termination from his position in June 2022, Plaintiff was employed by FedEx Express in the position of Courier (DOT).

41.     At all relevant times, Plaintiff's duties included, without limitation:

a.  Unloading packages from a conveyor belt into a FedEx Express vehicle at the start of the day.

b.  Operating a FedEx Express vehicle[1];

c.  Delivering packages to FedEx Express customers, and picking up packages from FedEx Express customers pursuant to a route and schedule assigned by FedEx Express;[2]

d.  Meeting on road with other drivers mid-shift to pick up additional packages, as directed by FedEx Express;

e.  Handling customer inquiries regarding lost packages and searching for lost packages, and;

f.  Performing administrative tasks such as maintaining and reporting records of deliveries, delivery issues and delays to FedEx Express, ensuring that the vehicle was fueled and filling gas when required, performing inspections of the company vehicle for defects, deficiencies, and safety concerns (which were commonplace) at the start and end of each shift and preparing a daily driver vehicle inspection report ("DVIR") as required under federal and New York State regulations.

42.    At all relevant times, FedEx Express required Plaintiff to report to a FedEx Express station for each work shift and return to the same station at the shift's conclusion.

43.    As a Shuttle Driver (DOT) between 1996 and 2019, Plaintiff was required to report to the FedEx Express station in Hicksville, NY at the start of each shift. During this period, Plaintiff was assigned to a FedEx Express Shuttle route, whereby Plaintiff was required to operate a FedEx

---

[1] Plaintiff was qualified and required to operate a wide range of vehicles in FedEx Express's mixed fleet of vehicles, ranging from small cargo vans with GWRs of under 5,000 to midsize and large step vans.

[2] At all relevant times, FedEx Express assigned Plaintiff to a route entirely within New York State and did not require Plaintiff to leave New York.

Express Shuttle between the FedEx Express Hicksville station and John F. Kennedy International Airport in Queens, NY.

44.     As a Courier (DOT) between 2019 and 2022, Plaintiff was required to report to the FedEx Express station in Melville, NY (known as FRG) at the start of each shift to pick up a FedEx Express vehicle and packages for delivery, and perform deliveries and pickups on an assigned route in East Northport, NY and Fort Salonga, NY, and then return the vehicle to the Melville station following the completion of his assigned deliveries and pickups. During his time as a Courier (DOT), in addition to the aforesaid baseline work along his assigned route, FedEx Express regularly directed Plaintiff to meet with other drivers mid-shift to collect additional packages for delivery, and/or complete out of the way pickups.

45.     Additionally, at all relevant times, Plaintiff was also required to complete administrative tasks each day, including reporting required by FedEx Express, inspections of the vehicle, and preparation and submission of the DVIR, and fill the vehicle that he was operating with gas regularly.

46.     FedEx Express required Plaintiff to complete his daily duties each day pursuant to a tight, high-pressure schedule, and would reprimand Plaintiff for any derogation from schedule regardless of the reason. Plaintiff's direct supervisor during his tenure as a Courier (DOT) at the Melville station, Operations Manager Elizabeth Mastropolo, would yell at and berate Plaintiff using pejorative language if Plaintiff did not adhere strictly to schedule, regardless of the the reason for the delay.

47.     Based on Plaintiff's observations and conversations during his employment, FLSA Collective Plaintiffs and Class Members had identical or substantially similar job duties to Plaintiff, including operating a FedEx Express vehicle, performing deliveries and pick-ups on an

assigned route, in addition to other pick-ups and deliveries directed by FedEx Express, and completing administrative work and paperwork. Like Plaintiff, FLSA Collective Plaintiffs were required by FedEx Express to operate on a tight schedule and faced discipline to the extent that they failed to complete their work on time.

**Plaintiff's Hours and Compensation**

48.     From 1996 to approximately late 2019, Plaintiff worked part-time at FedEx Express – first as a Shuttle Driver (DOT), and subsequently as a Courier (DOT). During this period of part-time work as a Shuttle Driver (DOT) and Courier (DOT), Plaintiff worked approximately 5 days per week, with each shift lasting approximately 4-8 hours from start to end, for a total of approximately 30-35 hours of work per week.

49.     From April 2020 until the end of his employment at FedEx Express in approximately August 2022, Plaintiff worked full-time as a Courier (DOT). During this period of full-time work, Plaintiff worked 5-6 days per week, with each shift lasting approximately 8-11 hours from start to end, for a total of approximately 50-65 hours of work per week.

50.     During his employment at FedEx Express, Plaintiff regularly worked in excess of 40 hours per week. Similarly, FLSA Collective Plaintiffs and Class Members regularly worked in excess of 40 hours per week.

51.     At all relevant times, FedEx Express required Plaintiff to clock in and out at the start and end of each shift using an electronic clock-in/clock out system located at the Melville station. Based on Plaintiff's observations and conversations, FLSA Collective Plaintiffs and Class Members were similarly required to clock in at the start and end of each shift at a given FedEx station or station.

52.     At all relevant times, Plaintiff was paid on an hourly basis:

a. From 1996-2019, as a part-time employee, Plaintiff's straight time hourly pay rate increased over the years to $32.40 in 2019.

b. From 2019-2022, as a full-time employee, Plaintiff's straight time hourly pay rate was $32.40 per hour and his overtime pay rate was $48.60 per hour.

Based on Plaintiff's observations and conversations, FLSA Collective Plaintiffs and Class Members were also paid hourly – but only for those working hours that FedEx Express properly compensated them for.

53.     Plaintiff, FLSA Collective Plaintiffs, and Class Members were not properly compensated for all working hours. Due to policies of wage theft instituted by FedEx Express that are discussed below, Plaintiff, FLSA Collective Plaintiffs and Class Members were systematically deprived of regular and overtime compensation for hours that they worked.

**FedEx Express Subjected Plaintiff, FLSA Collective Plaintiffs and Class Members to Time Shaving**

54.     At all relevant times, FedEx Express maintained a commonly-applicable policy of automatically deducting paid time from shifts worked by Plaintiff, FLSA Collective Plaintiffs and Class Members to account for purported mid-shift "breaks" that were unpaid, as follows:

a. Shifts that were 6 or more hours were subjected to a 30 minute deduction for a purported "break".

b. Shifts that were 8 or more hours were subjected to a 1 hour deduction for a purported "break".

55.     At all relevant times, FedEx Express's automatic deductions of paid time with respect to Plaintiff, FLSA Collective Plaintiffs, and Class Members for purported "breaks violated the law, because the deductions for "breaks" were a sham and excuse for time-shaving. Plaintiff,

FLSA Collective Plaintiffs, and Class Members did not receive *bona fide* breaks as FedEx required them to perform work during such periods.

56.     During Plaintiff's breaks, FedEx Express regularly contacted Plaintiff mid-shift regarding delivery status and other work-related topics (i.e., lost packages or additional pickups) and required Plaintiff to respond to and address these issues right away. In addition, Plaintiff was required to monitor messages from FedEx Express as the company would send him multiple additional orders during his breaks that had to be fulfilled promptly thereafter.

57.     FedEx Express set unreasonable schedules for Plaintiff to perform pickups and deliveries, requiring him to return to the station and/or report to distant locations immediately following breaks to complete deliveries or pickups. To comply with the tight schedules set by FedEx Express, Plaintiff was required to perform job duties during so-called "breaks" such as filling gas in the vehicle he was operating, and driving to the next location as directed by FedEx Express. Elizabeth Mastropolo and other FedEx Express supervisors were aware that Plaintiff was driving to the next location and filling gas during his so-called "break" periods, and not only permitted such work, but would reprimand Plaintiff for not performing his assigned work on time when Plaintiff did not devote his break time to such work tasks.

58.     FedEx Express required Plaintiff to spend his purported "breaks" performing administrative duties such as maintaining records of deliveries and pick-ups, reporting any delivery issues or delays to FedEx Express, inspecting the vehicle for defects, deficiencies, and safety concerns, and preparing the DVIR. Elizabeth Mastropolo and other FedEx Express officials were aware that Plaintiff was performing administrative duties during his so-called "break" periods, and would reprimand Plaintiff for not performing work on time if he did not complete the administrative work during his purported "breaks".

14

59.     FedEx Express's policy of automatically deducting purported "breaks" from Plaintiff's paid time amounted to unlawful time shaving because Plaintiff was never actually afforded uninterrupted, *bona fide* breaks, and was in fact required by FedEx Express to work during the so-called "breaks" as set forth above.

60.     Due to FedEx Express's above-discussed illegal time-shaving, Plaintiff was deprived of regular and overtime wages for approximately 30 minutes – 1 hour per week from 2018 – April 2020, when he was working part-time.

61.     During the period that Plaintiff was working full-time (late 2019 – June 2022), FedEx Express's time shaving resulted in Plaintiff being deprived of regular and overtime wages for approximately 3-6 hours each workweek.

62.     Based on Plaintiff's observations and conversations, FLSA Collective Plaintiffs and Class Members were similarly subject to time-shaving in the form of deductions for "breaks," even though they, like Plaintiff were not permitted uninterrupted, *bona fide* breaks, and were, like Plaintiff, required to work during the so-called "break" periods.

63.     Based on Plaintiff's observations and conversations during his employment, FLSA Collective Plaintiffs were frequently required by FedEx Express to respond to communications and inquiries during purported "break" periods, required by FedEx Express to report to the next location and fill gas during purported "breaks" and required by FedEx Express to work on administrative tasks and paperwork during purported "breaks," notwithstanding the automatic deduction of time for "break" periods.

64.     Like Plaintiff, FLSA Collective Plaintiffs and Class Members were deprived of regular and overtime wages due to FedEx Express's above-described time-shaving practice, and are similarly entitled to recovery of regular and overtime wages.

**FedEx Express Failed To Compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members For Compensable Off-The-Clock Time Spent "Donning and Doffing" Uniforms**

65.     FedEx Express maintains a policy of requiring drivers (including Plaintiff,  FLSA Collective Plaintiffs, and Class Members) to wear FedEx Express uniforms at all times while working. Drivers are not permitted to clock into work unless dressed in uniform, and may not remove their uniforms until after they finish working and clock out. Drivers are also discouraged from wearing their FedEx Express uniforms outside of work, because of the risk of liability.

66.     In accordance with these policies, at all relevant times, Plaintiff was required by FedEx Express to change into uniform off-the-clock prior to clocking in, and change out of his uniform off-the-clock after signing out. Plaintiff would arrive at the FedEx Express station and change in the restroom immediately before clocking in. At the end of the day, Plaintiff would likewise change out of uniform in the restroom. Plaintiff was not paid for the off-the-clock time spent changing in and out of his uniform.

67.     By failing to compensate Plaintiff for compensable off-the-clock time spent "donning and doffing," FedEx Express deprived Plaintiff of regular and overtime pay for approximately 30 minutes to 1 hour per week throughout his employment period.

68.     Based on Plaintiff's observations and conversations during his employment, FLSA Collective Plaintiffs and Class Members were similarly required under FedEx Express policy to change and out of their uniforms off-the-clock, were not paid for such compensable time, and were accordingly deprived of regular and overtime wages.

69.     FedEx Express never issued Plaintiff a wage-and-hour notice setting forth his compensation or other information required under NYLL 195.1. Nor did FedEx Express issue Plaintiff proper wage statements in compliance with NYLL 195.3. [3]

70.     Similarly, Class Members were not issued proper wage-and-hour notices or wage statements.

**FedEx Express Subjected Plaintiff To Disability Discrimination and a Hostile Work Environment, Failed To Accommodate His Disability, and Subjected Him To Retaliation**

71.     Plaintiff suffers from Generalized Anxiety Disorder ("GAD") and Attention Deficit Disorder ("ADD").

72.     Plaintiff was an outstanding and dedicated performer throughout his employment at FedEx Express.

73.     During his 25+ years of employment as a driver at FedEx Express, Plaintiff repeatedly received Safe Driving Awards and was never involved in a serious road accident.

74.     At all relevant times, Plaintiff held a commercial driver's license, was capable of lifting 50 pounds, and was in all other respects qualified to perform the essential functions of his job as a Courier (DOT) at FedEx Express.

---

[3] In failing to provide proper wage statements and notices, Defendant has failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendant's failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendant's conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being properly paid. Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendant's failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates, and commission payments deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Member's rights. This conduct ensured Defendant's ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Plaintiff and Class Members are therefore entitled to statutory damages.

75.     During late 2021 and early 2022, FedEx Express implemented a new policy of equipping certain vehicles in its fleet with Video Event Data Recorder ("VEDR") devices. VEDR devices are in-cab, driver-facing cameras and recording devices that facilitate constant, Orwellian video and audio surveillance of drivers.

76.     VEDR devices also frequently issue automated verbal commands and warnings to drivers that are distracting, and often erroneous. For example, the VEDR devices issue admonitions such as "*DISTRACTED DRIVING! DISTRACTED DRIVING!*" when drivers make unremarkable gestures such as wiping sweat off their forehead with their hands that simply do not indicate that the driver is distracted.

77.     Plaintiff's anxiety disorder was triggered by FedEx Express's implementation of the VEDR devices. Plaintiff experienced severe anxiety at the prospect of being required to operate a vehicle equipped with a VEDR device that facilitated Big Brother-style surveillance of him and constantly issued distracting and erroneous commands and warnings.

78.     FedEx Express's pre-existing employee policies did not provide that drivers must consent to FedEx Express surveilling them via VEDR devices.

79.      In approximately October 2021, FedEx Express presented Plaintiff with a online form stating that Plaintiff consented to FedEx Express's use of a VEDR device in vehicles that he operated (the "VEDR consent form"). FedEx Express demanded that Plaintiff immediately sign the VEDR consent form without offering Plaintiff a fair opportunity to review it.

80.     Plaintiff declined to execute the VEDR consent form.

81.     After FedEx Express presented him with the VEDR consent form, Plaintiff notified his supervisor, Ms. Mastropolo of his severe anxiety regarding the VEDR devices. Plaintiff further

told Ms. Mastropolo that he intended to request that FedEx Express grant him a disability accommodation.

82.     Ms. Mastropolo responded in a rude and derisive tone, telling Plaintiff that he did not have a choice in the matter and demanding that Plaintiff sign the VEDR consent form. Plaintiff again refused to sign, telling Ms. Mastropolo that it was illegal to coerce his consent.

83.     In early March 2022, despite being aware of Plaintiff's stated objection to the VEDR device and intention to seek a disability accommodation, FedEx Express installed a VEDR device in the FedEx vehicle that Plaintiff customarily drove overnight, without giving Plaintiff prior notice.

84.     Thereafter, in March 2022, Plaintiff submitted a formal request that FedEx Express accommodate his disability.

85.     Plaintiff's accommodation request was supported by a note from Plaintiff's psychiatrist confirming Plaintiff's clinical diagnosis, that Plaintiff was experiencing severe anxiety regarding FedEx Express's new policy of installing VEDR devices and stating that requiring Plaintiff to operate a vehicle equipped with a VEDR device would be dangerous in view of Plaintiff's severe anxiety regarding the VEDR devices.

86.     Plaintiff's accommodation request included a proposed accommodation – specifically, that FedEx Express remove or disable the VEDR device in the FedEx Express vehicle that Plaintiff customarily operated. However, Plaintiff made clear that he would be open to considering alternative accommodations. Plaintiff and his doctor indicated that an alternate possible accommodation could be at the very least a camera that was not constantly directed at Plaintiff's face.

87.     FedEx Express took approximately 3 months (March 2022 – June 2022) to decide Plaintiff's accommodation request and inform Plaintiff of the decision. During this lengthy review period, FedEx Express never communicated with Plaintiff regarding his request, and did not propose any alternate accommodations. FedEx Express instead maintained radio silence.

88.     During the 3 month review period, notwithstanding Plaintiff's pending disability accommodation request, Ms. Mastropolo urged Plaintiff to sign the VEDR consent form. In response to Ms. Mastropolo's demands, Plaintiff again reiterated to Ms. Mastropolo that the new VEDR policy caused him anxiety, that FedEx Express was considering his accommodation request, and that it was unlawful to force Plaintiff to sign the VEDR consent form. Ms. Mastropolo disregarded these concerns, admonishing Plaintiff for questioning FedEx Express's policies and refusing to sign the consent form.

89.     During the 3 months that FedEx Express was reviewing Plaintiff's accommodation request, FedEx Express permitted Plaintiff to operate different FedEx Express vehicles not equipped with VEDR devices. Plaintiff was able to operate these alternate vehicles and perform his job duties capably.

90.     On or about June 17, 2022, FedEx Express's Corporate Human Capital Management Committee issued Plaintiff a cursory and disingenuous letter dated May 25, 2022 denying his accommodation request (the "Denial Notice").

a.  Although the Denial Notice claims that FedEx Express reached the decision to deny Plaintiff's accommodation request "[a]fter careful review," it reflects no sign of any good-faith consideration whatsoever.

b.  The Denial Notice includes no analysis of Plaintiff's request.

20

c.   The Denial Notice does not even mention Plaintiff's disability or the psychiatrist's note that Plaintiff provided in support of his accommodation.

d.   The Denial Notice instead appears to state that FedEx Express's decision to deny Plaintiff's request was based solely on FedEx Express's vague and unsupported belief that as a general matter, surveillance of drivers via VEDR "improves driver behavior."

e.   The Denial Notice fails to explain why Plaintiff's proposed accommodation was purportedly unreasonable.

f.   The Denial Notice fails to justify imposing the VEDR requirement on Plaintiff, particularly given that Plaintiff's request and psychiatrist's note demonstrated that requiring Plaintiff to operate a vehicle outfitted with a VEDR would be dangerous.

g.   The Denial Notice proposes no alternative accommodation (the Denial Notice did not even propose an alternative accommodation of permitting Plaintiff to continue using FedEx Express vehicles without VEDR devices, even though Plaintiff had capably operated FedEx Express vehicles that did not feature VEDR devices throughout the review period without issue).

91.   FedEx Express failed to engage in any kind of interactive process, and evidently did not consider Plaintiff's accommodation request in good faith.

92.   On or about June 17, 2022, right after Plaintiff's receipt of the Denial Notice, Ms. Mastropolo informed Plaintiff that, now that FedEx Express had denied Plaintiff's accommodation request, Plaintiff would be required to operate a vehicle outfitted with a VEDR device.

93.   Ms. Mastropolo told Plaintiff that he would be required to operate a FedEx Express vehicle with a VEDR system or he would be out of a job. Plaintiff complained to Ms. Mastropolo

that FedEx Express's denial of his accommodation was unlawful, and that it was illegal for FedEx Express to coerce Plaintiff into consenting to the VEDR system.

94.     At this point, due to FedEx Express's illegal and bad-faith denial of his accommodation request, the prospect of imminently being required by FedEx Express to operate a vehicle under the constant monitoring of a VEDR, and the hostile work environment to which Ms. Mastropolo subjected him due to animus towards his disability status, Plaintiff began to experience extreme anxiety (including palpitations, nausea, shortness of breath, and profuse sweating).

95.     Plaintiff told Ms. Mastropolo of these medical symptoms and requested to be permitted to leave and seek medical treatment, telling her "*I feel like I'm dying*".

96.     Even though Plaintiff was visibly shaken, to the point of having trouble walking straight, Ms. Mastropolo responded that she did not care and rudely ordered Plaintiff to "**get in the truck!**" Despite being on the verge of a panic attack, Plaintiff had no choice but to follow Ms. Mastropolo's orders to drive that day.

97.     Shortly thereafter, while driving the FedEx Express vehicle, Plaintiff suffered a severe panic attack and contacted his psychiatrist, whose office directed Plaintiff to seek immediate medical attention at an emergency room.

98.      Plaintiff called Ms. Mastropolo to tell her of this emergency situation (Plaintiff felt that he was about to have a heart attack) and that he was directed to seek immediate medical treatment. Plaintiff begged Ms. Mastropolo to allow him to return to the station, or dispatch a different FedEx Express driver to Plaintiff's location to relieve Plaintiff in view of Plaintiff's medical emergency.

99.     Ms. Mastropolo refused to allow Plaintiff to seek immediate medical attention. Ms. Mastropolo claimed that that she would send out a replacement driver but failed to do so.

100.    Plaintiff repeatedly attempted to reach Ms. Mastropolo by phone to request that he be permitted to drop the vehicle off at the station or have an alternate driver relieve him, but Ms. Mastropolo ignored his calls, showing callous disregard for Plaintiff's medical emergency.

101.    Despite notifying Ms. Mastropolo that he was experiencing a panic attack and had been directed to seek emergency medical treatment, Plaintiff was forced to remain in the FedEx vehicle he was operating for several hours.

102.    On June 20, 2022, Plaintiff provided Ms. Mastropolo a note from his psychiatrist stating that, due to FedEx Express's VEDR policy, Plaintiff was enduring extreme ongoing anxiety and had suffered a panic attack on June 17, 2022. Plaintiff's psychiatrist recommended that Plaintiff take "a [medical] leave of absence until this matter can be rectified."

103.    On or about June 21, 2022, Plaintiff texted Ms. Mastropolo regarding his psychiatrist's note. Ms. Mastropolo responded belatedly, showing no concern for Plaintiff, and told Plaintiff that FedEx Express had left a letter for Plaintiff at the front counter of the station.

104.    On June 28, 2022, Plaintiff received a written notice from FedEx Express signed by Ms. Mastropolo stating that, effective June 21, 2022, "you are being removed from your current position of Courier/DOT because of refusal of acknowledging cameras in all FedEx vehicles." The FedEx Express notice further told Plaintiff that he was placed on unpaid leave status for 90 days, and that, if he was unable to find an alternative position at FedEx Express for which he was qualified in that period within 90 days, his employment would be terminated.

105.    During the 90-day period, Plaintiff diligently searched for another position within FedEx Express.

106.    However, FedEx Express refused to consider Plaintiff for driver positions for which Plaintiff is qualified, and had no other positions available in the area for which Plaintiff was qualified. Therefore, in effect, Plaintiff was terminated.

107.    FedEx Express's termination of Plaintiff was due to animus towards his disability and in retaliation for protected activity, including Plaintiff's accommodation request and other protected complaints.

108.    Plaintiff is entitled to substantial damages on the basis of FedEx Express's discriminatory and retaliatory treatment.

**FedEx Express Is Liable To Plaintiff For Breach of Contract and/or Promissory Estoppel**

109.    At the time of his unlawful termination, Plaintiff had accrued 6 weeks of paid vacation time pursuant to FedEx Express's policies. In violation of its contractual obligations and/or binding promises to Plaintiff, FedEx Express refused to pay Plaintiff for such paid vacation time.

110.    Plaintiff retained TA Legal Group PLLC as counsel to represent Plaintiff, FLSA Collective Members, and Class Members in this litigation and agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I – COLLECTIVE-WIDE ACTION VIOLATION OF THE FLSA

111.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

112.    At all relevant times, Defendant has been and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the

FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

113.    At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

114.    At all relevant times, Defendant had gross annual revenues in excess of $500,000.

115.    At all relevant times, Defendants violated the FLSA because of their policy and practice of failing to pay Plaintiff the full amount of overtime wages.

116.    Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendant. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Members for all hours worked, including overtime hours, when Defendants knew or should have known such was due.

117.    Defendant failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

118.    As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

119.    Due to the intentional, willful and unlawful acts of Defendant, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime

wages. Plaintiff is entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II – RULE 23 CLASS-WIDE VIOLATION OF THE NEW YORK LABOR LAW

120.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

121.    At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

122.    Defendant knowingly and willfully failed to pay Plaintiff and Class Members overtime wages in violation of the NYLL.

123.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage statements as required under the NYLL.

124.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage and hour notices as required under the NYLL.

125.    Due to the Defendant's NYLL violations, Plaintiff and Class Members are entitled to recover from Defendant overtime wages, reasonable attorneys' fees, liquidated damages, statutory penalties and costs and disbursements of the action, pursuant to the NYLL.

## COUNT III – ACTUAL/PERCEIVED DISABILITY DISCRIMINATION IN VIOLATION OF THE NYSHRL

126.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

127.    At all relevant times, Defendant was an employer within the meaning of the NYSHRL.

128.    At all relevant times, Plaintiff was an employee within the meaning of the NYSHRL, and therefore entitled to protection from discrimination based on actual or perceived disability.

129.    Plaintiff was qualified to hold his position of employment with Defendant and satisfactorily performed his duties.

130.    Plaintiff suffers from GAD, ADD and clinical anxiety, which the NYSHRL recognizes as a disability.

131.    Alternatively, Plaintiff was perceived by Defendant to be disabled.

132.    Defendant discriminated against Plaintiff in violation of the New York State Human Rights Law on the basis of actual or perceived disability.

133.    Pursuant to the unlawful acts and practices of Defendants alleged herein, Plaintiff was mistreated in employment, and subjected to inferior terms, conditions and/or privileges in employment, due to actual or perceived disability status.

134.    Defendant discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated employees outside of Plaintiff's protected class.

135.    Defendant discriminated against Plaintiff by subjecting him to a hostile work environment, disparate terms and conditions of employment, and other forms of discrimination based on his actual or perceived disability status, in violation of the law.

136.    But for Plaintiff's disability or perceived disability status and protected class membership, Plaintiff would not have been subjected to discrimination or unlawfully terminated.

137.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability

and earning capacity, painful embarrassment among his family, friends, and co-workers, damages to his good reputation, disruption of his personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

138.    The discrimination and hostile work environment, and retaliation  Plaintiff suffered while employed by Defendant severely affected the terms and conditions of his employment.

139.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

140.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law as to Defendant, including but not limited to compensatory damages, lost wages, emotional distress damages and attorney's fees.

141.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

## COUNT IV– FAILURE TO ACCOMMODATE DISABILITY IN VIOLATION OF THE NYSHRL

142.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

143.    Plaintiff suffers from GAD, ADD and clinical anxiety, which the NYSHRL recognizes as a disability.

144.    Defendant was on notice of Plaintiff's disability.

145.    With reasonable accommodations as stated hereinabove, Plaintiff could perform the essential functions of the position.

146.    Defendants refused to make such accommodations.

147.    Defendant refused to engage in the legally-required interactive process.

148.    Defendant's refusal to accommodate Plaintiff's disability was discriminatory and resulted in adverse action towards Plaintiff.

149.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damages to his good reputation, disruption of his personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

150.    The discriminatory failure to accommodate that Plaintiff suffered while employed by Defendants severely affected the terms and conditions of his employment.

151.    By reason of Defendant's discriminatory failure to accommodate his disability, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law as to Defendant, including but not limited to compensatory damages, lost wages, emotional distress damages and attorney's fees.

152.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

## COUNT V– RETALIATION IN VIOLATION OF THE NYSHRL

153.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

154.    Plaintiff repeatedly complained to Defendant and/or Defendant's policymakers about the severe and pervasive actual and/or perceived discrimination, hostile work environment and retaliation he was subjected to during employment with Defendant.

155.    Plaintiff notified Defendant of the severe actual and/or perceived disability discrimination, hostile work environment, and retaliation that he was subjected to and repeatedly protested to the harassment and discrimination.

156.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendans in accordance with Defendant's policy, practice, and/or custom of actual and/or perceived disability discrimination and retaliation.

157.    Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of disability discrimination, hostile work environment, and retaliation.

158.    Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation during the course of his employment.

159.    The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

160.    Defendant knew or should have known about the retaliation and the effect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

161.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due to him.

162.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

163.    As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself, harm to his employability and earning capacity, painful embarrassment among family, friends, and co- workers, damages to his good reputation, disruption of his personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

164.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

165.    Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law as to Defendant, including but not limited to compensatory damages, lost wages, emotional distress damages and attorney's fees.

166.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

### COUNT VI – BREACH OF CONTRACT/PROMISSORY ESTOPPEL

167.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

168.    Defendant is liable to Plaintiff for breach of contract or, alternatively, promissory estoppel.

169.    Alternatively, Defendant sufficiently and unambiguously promised to pay Plaintiff for unused accrued vacation time.

170.    Defendant accepted Plaintiff's services and benefited from the contract or binding promise.

171.    Defendant breached its contractual obligations with Plaintiff by failing to pay Plaintiff for unused accrued vacation time.

172.    Alternatively, Defendant is liable on a theory of promissory estoppel, because Plaintiff reasonably relied on Defendant's promises to his detriment, and injustice to Plaintiff can be avoided only by enforcing the promise made.

173.    Plaintiff is entitled to damages, including but not limited to monetary damages and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under FLSA, NYLL, the NYSHRL and New York common law.

b.  An injunction against Defendant and its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.  An award of unpaid overtime wages under the FLSA in favor of Plaintiff and FLSA Collective Plaintiffs in an amount to be determined.

d.  An award of unpaid overtime wages under the NYLL in favor of Plaintiff and Class Members in an amount to be determined;

e.  An award of liquidated damages as a result of Defendant's willful failure to pay wages pursuant to the FLSA in favor of Plaintiff and FLSA Collective Plaintiffs;

f.  An award of liquidated damages as a result of Defendant's willful failure to pay wages pursuant to the NYLL in favor of Plaintiff and Class Members;

g.  Lost back and front wages, emotional distress damages, unpaid benefits, and other compensatory damages under the NYSHRL in the amount of $5,000,000;

h.  Punitive damages under the NYSHRL in the amount of $5,000,000;

i.  An award of monetary damages for breach of contract or, alternatively, promissory estoppel.

j.  An award of prejudgment and post-judgment interests, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties;

k.  Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs.

l.  Designation of this action as a class action pursuant to Fed. R. Civ. P. 23.

m.  Designation of Plaintiff as Representative of the Class.

n.  Such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated:       Huntington, NY
             June 18, 2024

**TA LEGAL GROUP PLLC**
*Attorneys for Plaintiff Peter Macci,*
*FLSA Collective Plaintiffs and Class Members*

By:    _____
       Taimur Alamgir
       315 Main Street, Second Floor
       Huntington, NY 11743
       Tel. (914) 552-2669
       tim@talegalgroup.com